My name is Kristen Lawson and I am appellate counsel for the plaintiff below, Mrs. Smith-Jordan. We'll probably refer to her as Jordan just for ease of diction. This appeal really turns on just a few things, one, whether the verdict was against the weight of the evidence, whether several pernicious occurrences tainted the proceedings, whether evidentiary rulings substantially affected her rights, the use of improper defense tactics by defense counsel, including misrepresentation of evidence to the jury, and whether those combined to irreparably harm her ability to fairly and fully present a trial before the jury. If Your Honors prefer, we can go straight into the question-and-answer session. Otherwise, I can continue with the arguments. It's really up to you guys. It's completely up to you. It's your time. I prefer question and answer so that I can make sure we address everything that you guys have that you're considering. Do any of you have a question? Where in the record should we look for the support of your argument that RPM conceded liability? Saying you're in the course and scope of your employment is not the same thing as conceding liability. And that is correct, Judge Elrod. So, there may have just been a misuse of the language in the brief. We weren't saying that they admitted liability. The point was to state that RPM had said to the extent liability was found in their driver, they accepted that they would have been vicariously responsible for that liability. But there is certainly, in this case, a dispute as to liability and comparative fault. If we think that the liability determination by the jury is appropriate, then we don't need to get into any of the evidentiary issues related to your damages, do we? Well, I don't know that it can be so easily said that the liability determination is appropriate. When you look at the testimony of the plaintiff and the defendant, their testimony fairly well aligns. And that is that the defendant who pulled to the side of the road, he admitted that he got two, possibly three wheels completely off of the main roadway while he was on the phone with his customer trying to figure out where he was because he was lost. And that he proceeded to swerve back into the main roadway with his eyes closed and at the time of the collision did not even see the plaintiff and had not seen her prior to that. The plaintiff's testimony is that she observed the defendant driver pull off the roadway, that his brake lights were on, that she saw somebody else pass him freely and clearly, and that the brake lights did not turn off, nor did she see movement as she proceeded to pass him. And so when you're looking at that from a comparative fault standpoint, both of those admissions suggest that they both violated the standard duty of care. Well, the jury was asked if love was at fault and said no. So it's a very high standard. And you don't even get to the comparative question. It's the same, because I wanted to make sure it's the same. It's the same as what I'm familiar with in Texas. It's predicated. There's nothing wrong with predicating it. So we never get to the comparative fault because they said no on the number one question. That is very true. And our position is that they said no on the number one question because they were presented with six days of improper, misleading, biased testimony not based on any record facts and evidence that should have never been admitted in the first place. And so when you have a fault assessment that is arguably 50-50, a comparative at best, and then you follow that with five days of improper, misleading, prejudicial testimony, that is cumulative in nature. It's not just one witness. You know, that's why we have Rule 49 submissions, which is not a special issues practice of the state court. It's so that we can ask those questions sequentially and cushion them, as we say, as we ask the first question. Do you find the part of this evidence that? If you have answered no, yes, then proceed to number two. Otherwise, no. That's a standard tool in the district court, and it's very powerful. And it's written for this very reason, that it cures a lot of mistakes, and otherwise they may. So what do we do with that? A special verdict is certainly helpful, particularly in these types of cases. I cannot speak to why Judge Malazzo did not allow a special verdict in this case. It isn't part of the trial record below as to why any type of verdict form was chosen over another. So that's not. There's nothing special about this. This is the standard procedure in federal court, unlike the state court. This is the way you submit a case. You submit an antitrust case. You submit a securities case that way. Whatever else. You use sequential questions, and it has a very powerful effect of judicial economy, et cetera. We're not going to talk about all the damages issued if you never get off the mark of liability. Oh, sure. But . . . So you're going to have to demonstrate some infection from the evidence of that first one, and I have never seen what that is. Well, I think there's two issues. The first is that a special verdict form would have allowed for more leeway in the negligent questions. Do you find the plaintiff had any liability? Do you find the defendant had any liability? If so, that's a portion fault. We never got there because it was just as singular was the defendant liable. They answered no. So to your point about whether that verdict was infected by the rest of the testimony, I don't see how a reasonable juror could not have been confused and had their determination interdicted. And here's why. The district court itself, the judge herself, said multiple times throughout the trial that she was confused. Day five, she says, I am very, very, very, very confused. I am concerned about this testimony. I am concerned RPM . . . But she was addressing those remarks, as I recall, to the system of factoring . . . To all of it, yes. She addressed it to whether RPM had even put on evidence of bias or collusion. Those comments in particular on day five, and I can get you the record citations if you want. And her point was, look, I told you guys you could bring in this evidence about the factoring agreements, and a couple of these experts don't testify because you told me, defense counsel, that you had evidence of bias and collusion, and you do not. And I'm reading the transcript, and I've heard the last four days of trial at this point. You put on new evidence of this. Where is it? And what does counsel say? They say, well, Your Honor, give us some leeway. Let us link the dots. If this mysterious witness who never shows up shows up, we're going to be able to prove it all. Well, the witness never showed up. They never proffered any evidence to prove it, and to this day, the trial court record and the trial record itself is devoid of any substantive proof of bias or collusion or improper motive or conduct. And so when you look at the judge, Judge Molasso, who is this esteemed, respected judge that was obviously confused about these issues and waiting for the evidence to be produced and giving them leeway, and it not happening, and her literally saying, well, you know what? Maybe I need to change my pretrial rulings as to the rest of the evidence you guys can get in because you haven't proved this up. I mean, how could the jury not be confused if the judge is confused? I don't understand how the jury could have heard witness after witness after witness after witness, the plaintiff's lawyers, the plaintiff, the plaintiff's doctors. They are colluding. They're here to get a windfall. They're here for improper, nefarious, illegal motive. They're breaking state laws. They're breaking federal laws. They are doing everything inappropriate under the sun. I've never seen anything so bad in my entire career. They literally argue in closing, this is the worst evidence of bias of bad faith I have ever seen, and yet there was none, and even Judge Molasso said you had no evidence of bias or bad faith. How is a jury not confused? All right. Anything else? You've saved time for rebuttal. I have saved time for rebuttal. Do you guys have any other questions? We certainly have arguments that we put in here as to inappropriate statements regarding truthfulness and the character of the witnesses, the truthfulness and candor of plaintiff's counsel. You have not waived anything that's in your brief. Okay. Thank you, judges. We will save the rest for rebuttal. Thank you, Ms. Boston. Mr. Minor? I require a little bit more paper, I apologize. Good morning, Your Honor. Andrew Minor on behalf of the Appellee RPM Pizza, LLC. I don't disagree that this is a pretty limited appeal. There are basically three issues. One, and Judge Elrod, you hit this on the head, whether or not the jury's verdict finding Mr. Love not liable in this accident is supported by the evidence. The second one, whether or not a witness can be attacked based on their bias and credibility in impeachment under 607, or doing so is going to prejudice the jury so that they can't properly follow the law and make a liability determination. And the third, there were some arguments raised about subsequent case law. It may be okay here. I'm not prejudging what's going to happen here. But what was the basis of talking about attorneys and victims and that sort of thing when it wasn't ever linked to any actual bad conduct? The trial judge herself said, when are you going to link up this bad conduct? What's the point of besmirching lawyers in this way and victims without anything to back it up? There were two issues here. One, there was a motion regarding the factoring and whether or not you could  That motion was denied. That evidence, however, was allowed for the limited purpose of impeaching the treating physicians and showing the bias of treating physicians. That issue is one issue in and of itself. What about the lawyers? Correct. The second issue. So I disagree with the allegation that we besmirched the lawyers specifically. I will admit that there was some evidence that did not make it into this trial. I forgot to proffer it at the end of trial after the verdict was rendered. However, some of that evidence is in the appellate record that there was, in fact, collusion between the funding company directing treatment, counsel directing what doctors they went to, what treatment was done. If it's not in the trial record, how can we consider that? It was in the appellate record, and we didn't. It's in the appellate record, but not the trial record. And I understand there's this distinction. And we're not asking it to be considered. The bias of the treating physician. You just brought it up. I understand. I was just pointing out that some of that evidence is there. But it's not there if it wasn't there at the trial. Correct. But it is if it piques your curiosity. It's available in the appellate record and attachments to motions. However, there was a witness that was supposed to be called to this trial. She was under a federal subpoena to do so. She had given testimony about subsequent e-mails that she produced after her discovery deposition. She did not appear at trial. The marshals were sent to her house. She was not found until the day after trial. So that evidence that was to be authenticated was unable to be authenticated, so it did not make it into the trial record. That was mostly e-mails between the funding company and a third-party management, this young lady who did not appear for trial, selecting which doctor she would go to and coordinating it that way. But the evidence that was submitted to the jury was done so as to the physician's bias. The argument of this illegal collusion wasn't what the purpose of this evidence was for. While that might have existed and didn't make it into the trial record, I admit that. What is in the trial record is that these specific doctors had a bias, and that bias was probed because of the way the funding structure was set up for them to get paid for this treatment. But I just want to make sure that you understand that it's inappropriate to talk about illegal collusion if you don't actually have evidence to back that up. I understand. And that is part of the thing that the jury can consider. I understand. You can't just throw it out there without having actual evidence to back it up. I understand that. And I don't believe it was said specifically that there was something illegal or there was collusion. The argument that we made that the billing scheme was illegal was in pre-trial motion practice. The trial record used the word scheme, yes, Your Honor. And we might have adopted that. Perhaps it has a bad connotation. It wasn't meant in that way. There was a concocted effort to fund this treatment, and that treatment was funded through third-party funding. It goes to the court. It wasn't meant in that way. Let's be honest here. It was not. And had this witness shown up, I think we would have a much different argument as to what is being presented here. But she did not. So that evidence is not in the trial record. Again, it's in the appellate record if the court wants to consider it. But, again, it's not in the trial record regarding this appeal. But the argument regarding provider bias is separate and distinct from a concerted illegal fraud action. We didn't raise fraud. We didn't raise collusion. We didn't raise bad faith. This argument goes to the provider's bias, an incentive to causally relate treatment to an accident in order to have financial gain. What have the Louisiana courts done with this practice of, they call it factoring, whatever, of medical expenses? Sure. That's been a recurring issue. Correct, Your Honor. And the courts haven't addressed this specific issue. The Supreme Court in 2022 in the George decision did come out and say that the factoring agreements, if the plaintiff is still responsible for those bills, do not come in to reduce the value of the past medicals that are presented at trial. The trial court here did the exact same thing. We did not challenge the value of the past medicals. The plaintiffs put on evidence that they had $850,000 in past medicals. We didn't object to that. The plaintiff testified to it. That's not what we did. As to this bias issue, I've only seen one Louisiana court case that deals with the presentation of that evidence as to physician bias. It was a First Circuit decision. It's called Gangzinger. My question really is a little more narrow one, and that is whether or not the Louisiana courts have addressed the legitimacy at all of this practice of factoring, where the medical expenses are very, very high, as they tend to be anyway, but their obligation is cushioned on the outcome of liability. The implication is that the doctors are charging a lot more than they would otherwise, but they are taking the risk of the verdict. Yeah. The Louisiana courts have not addressed that issue specifically. The closest they have come is that George decision that came out post after this trial happened and after this verdict, and that decision only was in regards to a motion to eliminate and limit past medicals based on the existence of that factoring. Louisiana does have some laws regarding factoring and allowing factoring as a business practice. I don't think the practice in and of itself is illegal under Louisiana law. I think the issue that what we raised is illegal under this had to do specifically with one of the treaties. What was the total amount of her medical? About $850,000. $850,000. She walked away from the accident, and the accident report said no injury. Correct. She walked away from it on disputed liability. Is there evidence that she picked up, I'm having trouble picturing this, she picked up her boyfriend of some sort like that? Correct. There was some testimony by her that she was unable to continue to lift a gallon of milk despite having multiple surgeries, yet there was surveillance evidence put in as to her credibility that didn't qualify. Part of that story was before the jury about her physical ability. So she put on testimony about her physical ability, and on cross-examination the surveillance video of her and that altercation with her boyfriend was played to the jury because she indicated that it would more probably demonstrate what happened to her testimony. What was the evidence to connect up the medical expenses with the injury, with the accident? So she had her doctors testify that it was causally related based on her testimony to them, or her statements to them that she didn't have this pain prior and she had the pain accident. That was the extent of their causation analysis. We challenged that analysis by bringing in the fact that these doctors were charging 500 to a thousand times the going rate in the community to make those causal relations while the company paying for those opinions was not asking any questions. They did not investigate the merits of the accident. They did not investigate whether or not causation existed. They did not ask. They took the doctor at his word and then paid him straight up under a contract. They didn't question the amount of the billing. They didn't question whether or not it was reasonable or customary at all. They just write a check 30 days and put it on an Amex card. And that's what we used that evidence to show in this case was that bias, that incentive to make these high rated fees for medical treatment in exchange for a causation opinion. The plaintiffs did the same thing. There are nine exhibits introduced regarding our experts invoices to us. In the opening statement, one of our experts was referred to as biased against plaintiffs. And that's a direct quote. The plaintiffs referred to our doctors as, their doctors as fine doctors, honest doctors, implying that ours were not. I mean, it goes both ways. The bias of these experts is grounds for challenge in the trial court. And that's the only reason we brought that evidence in. In the event that that lady who did not show up at trial had, there would have been evidence of something bigger. The argument isn't as extensive as it's argued in the plaintiff's brief. We didn't necessarily, we didn't plead fraud. We argued bad faith, but not in the sense of the past medical should be reduced because the court had already decided that that was not the case. We had argued solely that this evidence, when is to bias whether or not attorneys were involved in it, whether or not the funding company directed the treatment doesn't go into the bias issue. It's a separate issue. And admittedly, the trial court record does not contain that evidence because the witness who had that evidence did not show up. What is in the trial record is that this person did exist and that her job was to be a liaison between the doctors and the attorneys that she was paid by the funding companies and that her job was to coordinate that treatment. I said, where did it didn't show up? Was she under a subpoena? She was under a subpoena. Yes. So the court, I think it's on page two in the record. He went, the court emailed her, the court called her, the court sent marshals to her house. She was not located until the morning after trial. And she was brought in and reprimanded post the verdict. There was actually two witnesses that were not appear to trial. Dr. Jolly was also under federal subpoena and did not appear. His testimony was read in after being redacted by the parties and through the trial court. So, and judge Laura, I think you hit it on the head. I don't think all of that matters. The jury made a liability determination in the given great deference. That termination could have been made solely on the plaintiff's credibility. And there was plenty of evidence in this trial regarding her personal credibility, but not only that there was conflicting evidence. The jury verdict didn't ignore comparative fault. Question one was, was Mr. Love at fault. Question two was, was Ms. Smith at fault. And then it had a place for the jury to allocate percentages of fault under comparative fault. They just didn't get that far. It took them less than an hour, but half of that hour was spent with them asking a question to determine that Mr. Love was not at fault at the accident. Therefore our PM was not. I think the four lines of, I'm sorry. The question was the question to the jury. Yes. Was Mr. Love. Do you find by a preponderance of the evidence that Mr. Love was at fault for the accident? No, I'm not. I'm sorry. I'm not talking about the charge. I'm sorry. Or the verdict for I'm talking about. I thought you said the jury asked a question. Oh, they asked for a copy of the police report that had been excluded by plaintiff's notion. And we told them that it wasn't in the record and it wasn't. Okay. That was it. But that took up a large portion of their deliberation time, which was less than an hour total. But their decision again. Is given the credibility determinations and we're entitled to that as the non-moving party, that it was based on liability and to argue that. And while, you know, I. Perhaps some of the statements might've been considered. Maybe not the most flattering on our part. The fact that there was, I counted it before I came up here, 138 pages of testimony regarding just liability. Isn't something the jury simply ignored because they didn't like the plaintiff. And if they did, it was because her credibility was tarnished. Or that her surveillance video. They did at first, but then the plaintiff herself testified that it would better represent what happened than her statements to the court. Okay. And so, and I think that's where this starts and ends. I don't think there was enough here. We didn't make anything up. There was some stuff that, yeah, we wish had gotten into the trial, but we could not. But I don't think it was enough to prejudice or change their mind on something that clearly they didn't even get to in their deliberations. There certainly was not enough time for them to go back and try to do math and all those medical specials. Let alone the future medicals that were requested. Yeah. Honestly, they probably ate lunch. I don't know. I wasn't involved. In state court, we get to ask. In federal court, we do not. And the only other issue that seems to be raised on the appeal were some subsequent case law. But I think that's entirely distinguishable from the facts here. And I won't address it unless the court has any questions on it. All right. Thank you, Mr. Minor. Thank you. Ms. Austin, for a vote. Yes. Thank you, Judge. I'd just like to point out Judge Malazzo, as she said during the course of trial, she would have changed her rulings. And her ruling in advance of trial was to permit RPM to put on arguments regarding the factory agreements, which they argued specifically to Judge Malazzo, have to do with the bill. And these are all quotes. Have to do with the billing scheme, a large portion of which are void based on illegal transactions, otherwise unenforceable, are not a collateral source, not reasonable, do not qualify for a lien, violate state and federal law, are illegal, inflated, fraudulent, seek an impermissible or unearned profit, contain mis- They're all statements made. They were statements made. And this is- And how were they made? Oh, I've got them cited all throughout the record. And I'm happy to give you the page that- No, I'm asking, was it just- So all of those- Trial testimony. All of those particular quotes are coming from the limiting hearings where the judge made the ultimate decision on the factory agreements. Why is- Well, that's not for the jury, so that's not- I understand that. The same arguments carried over and pervaded the trial. Now, you brought up the George case earlier, which was rendered in 2022, where the Louisiana courts ruled specifically on the admissibility of agreements. And in that case, the court said, you know what? The agreements don't come in. The funding mechanism does not come in. Any discount paid does not come in. Whatever the plaintiff's full bill is due and payable, that information comes in, completely contrary to what their argument is. And the reason the Louisiana Supreme Court said that is because without evidence of bias, without evidence of collusion or fraud or an intent on the plaintiff or the provider to artificially inflate expenses, the jury doesn't need to know. It's not within their province. And that's the problem here, is the judge got it wrong on the limiting motions. They were characterized for the entire duration of this case as illegal, improper, and fraudulent. And that carried through the trial. It carried through all nine defense witnesses. Do you claim that the surveillance video should not have been admitted at this point? No. The argument as to the video was that it was properly admitted when she opened the door on her exam. It was improperly used when during their closing arguments, they say things like, our experts explained this outrageous scheme, the scheme put together by the doctors, and the rest of the group involved with the plaintiff. The scheme that us as defense counsel has never seen before. I can't think of worse bad faith, worse behavior, worse billing. Never heard of it. 41 years. I don't even have to tell you what's reasonable and customary because you've heard it. And you know what they did at the same time? They put a picture of Ms. Jordan, a still shot from that surveillance video. One sliver of one second. But she said it accurately. They used it to say, this is the real plaintiff. Not this person that's over here pretending to be something else for you. This is the real plaintiff that is lying, cheating, and stealing from you and from everybody else to profit off this litigation. That is a very improper use. It's not habit. It's not proper conduct. It doesn't go to whether she is physically disabled or not. When they are giving a closing argument, talking about the group involved on the plaintiff's team as doing things improper and illegal. Ms. Lawson, you need to stay at the microphone so that the recording will pick up your voice. Thank you, Judge. When you have defense counsel making closing arguments as to the nefarious conduct and the lack of quality of candor and character of the plaintiff and her attorneys and providers, and they put up a picture, a still shot, from hours and hours and hours of surveillance. They found the worst picture of her to demean her character among the rest of the character. That's not proper. They had nothing to say about her physical ability when they were doing that. It was all about her quality of character, and there's no place in federal court for that. If they had a problem with the claim and the validity of the claim, go after that. If you have real proof the doctor's inflated billing or that she sought treatment she didn't need, go after that. They didn't have it. They still don't have it. They have promise of some person that may or may not exist. All right. Thank you, Ms. Lawson. Your case is under submission. Thank you, Your Honors. Enjoy the rest of your day.